IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 5, 2006 Session

## IN THE MATTER OF:  S. L. A.

**Appeal from the Juvenile Court for Fentress County**
**No. 2202A     Paul Crouch, Judge**

_____

**No. M2006-01536-COA-R3-PT - Filed on December 19, 2006**

_____

Mother appeals the termination of her parental rights, contending the evidence was not clear and convincing that she abandoned her child and that termination of her parental rights is in the best interest of the child.  The trial court found the mother had abandoned the child by engaging in conduct that exhibited a wanton disregard for the welfare of her child, which conduct included ingesting drugs while pregnant and while breast feeding, and the manufacture of methamphetamine in the family home.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

James P. Romer, Jamestown, Tennessee, for the appellant, F.M.S., a/k/a F.M.S.A.

Robert E. Cooper, Jr., Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, for the appellee, State of Tennessee.

## OPINION

On August 30, 2005, the Tennessee Department of Children's Services filed a petition to terminate the parental rights of the mother to her infant son on the grounds of abandonment, substantial non-compliance with the permanency plan, the existence of conditions that prevent the return of the child and that the termination is in the best interest of the child.

The child was born prematurely on February 8, 2004, weighing only 3.7 pounds.  At birth, he tested positive for opiates due to The mother's drug use while pregnant.  On March 4, 2004, shortly after the child was born, a DCS Child Protective Services investigator and a Fentress County law enforcement officer visited the mother's home upon a referral regarding her drug use.[1]  They discovered methamphetamine lab equipment and needles for drug ingestion in the home.  The

_____

[1]The child was in the hospital at the time of the investigation.

mother was subsequently arrested and pleaded guilty to facilitation to manufacture methamphetamine which led to her incarceration.[2]  The mother is currently in prison and not expected to be released until January 2007, at the earliest.

The medically fragile child was placed in the custody of well-suited foster parents shortly after the mother's arrest in March 2004.[3]  The child has remained in their care in the interim, and the foster parents are seeking adoption.  The mother's husband at the time of conception surrendered his rights when DNA testing of the child ruled him out as the father, and the identity of the biological father was unknown.[4]  Thus, the mother is the only party to the action.

The mother's parental rights were terminated in part due to the following findings of fact:

- The child was placed in the custody of the Tennessee Department of Children's Services due to dependency and neglect on or about March 4, 2004 and had remained continuously in foster care since March 4, 2004.

- The mother has been incarcerated continuously (first in jail awaiting sentencing and then prison) since the child entered foster care.  The mother was already on probation from a March 2003 conviction related to methamphetamine when she pled guilty in the Criminal Court of Fentress County, Tennessee on March 26, 2004 to the Class D felony of Facilitation to Manufacture Methamphetamine.

- The mother engaged in such conduct prior to incarceration (i.e. the conduct which led to her incarceration) as to exhibit a wanton disregard for the welfare of the child.

- The mother gave birth to the child prematurely and he tested positive for opiates on his meconium drug screen.  The mother admitted to the use of morphine and hydrocodone during her pregnancy for which she did not have a prescription.

- On the day of the Department's removal of the child (3-4-06), the mother and her husband had a methamphetamine lab in her home.  Numerous chemical components and paraphernalia commonly used to manufacture methamphetamine were found throughout the home by Fentress County Sheriff's Deputy Johnny Murphy who was accompanied by Department Case Manager Fisher.

---

[2] It is alleged in the record that the mother's husband made the methamphetamine lab.

[3] The foster mother was a licensed practical nurse experienced in respiratory diseases and other such ailments from which the child suffered.

[4] The mother testified that the father, whom she met in drug rehabilitation, goes by the name Jonah, but she could not provide further details of his identity.

• The mother was denied parole on June 13, 2005 due to the seriousness of her offense. Her next parole hearing review is December 2006.

Based upon the above findings, the trial court found multiple grounds for termination existed including abandonment pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv), and that conditions persist that prevent the return of the child pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A). The trial court also found that the termination of the mother's parental rights was in the best interest of the child pursuant to Tenn. Code Ann. § 36-1-113(i).

The mother appeals, contending that the state failed to prove by clear and convincing evidence that the mother "abandoned" her son and that the termination of her parental rights is in the best interest of the child.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. A court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000).

The clear and convincing evidence standard is a heightened burden of proof which serves to minimize the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. The clear and convincing evidence standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). It is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), yet it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App.1987). Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence, *see Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992), and it should produce a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). It is under this heightened standard that we must review the trial court's findings.

### ABANDONMENT

The termination of parental rights may be initiated as the result of a parent's abandonment of a child. Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs, *inter alia*, when the parent has "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv).[5] Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse. *See In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005); *State Dept. of Children's Services v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3 (Tenn. Ct. App. Oct. 25, 2001); *State v. Osborne*, No. 01A01-9810-JV-00564, 1999 WL 557543, at *6 (Tenn. Ct. App. Aug. 2, 1999).

In the case, *In re C.T.S.*, 156 S.W.3d 18 (Tenn. Ct. App. 2004), this Court affirmed the trial court's termination of parental rights on the ground of abandonment, Tenn. Code Ann. § 36-1-102(1)(A)(iv), finding that the mother's ingestion of crack cocaine while pregnant with her child and the child's addiction to cocaine at birth "clearly exhibits a wanton disregard for the welfare of the child." *In re C.T.S.*, 156 S.W.3d at 25.

In the present case, the mother admitted to using methamphetamine, morphine, and hydrocodone while pregnant with the child and earlier provided a statement to law enforcement explaining that she had "shot up"methamphetamine twice on the day that law enforcement and DCS arrived at her home. Further, after the child was born and the child remained in the hospital, the mother was storing her breast milk in the trailer that was converted to a methamphetamine lab, putting the child at greater risk due to the poisonous properties of the chemicals contained in a methamphetamine lab that could be inadvertently ingested along with the breast milk.[6]

---

[5]Tenn. Code Ann. § 36-1-102(1)(A) provides, in pertinent part: For purposes of terminating the parental rights of a parent of a child "abandonment" means that: (iv) A parent is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

[6]See *In re Meagan E.*, No. E2005-02440-COA-R3-PT, 2006 WL 1473917, at *5 (Tenn. Ct. App. May 30, 2006), for an officer's testimony noting that methamphetamine absorbs into anything porous and that the chemicals are highly poisonous.

The mother claims she did not know she was with child until five months into her pregnancy; however, the evidence indicates she used drugs in the later months of her pregnancy. This is due in part to the presence of opiates in the child's system at birth. She also admitted using drugs after the child's birth and while breast feeding the child.[7] When the child was one month old she admitted having "shot-up meth" and therefore continued to expose the child to health risks associated with methamphetamines.

This evidence, coupled with the additional circumstances, clearly demonstrate a wanton disregard of the child. Therefore, the mother's record contains clear and convincing evidence to support the trial court's termination of the mother's parental rights on the ground of abandonment pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv).

## CHILD'S BEST INTERESTS

The mother contends the evidence was insufficient to establish that termination of her parental rights was in the best interest of the child. In determining whether termination of parental rights is in the best interest of the child, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or

---

[7]While the child was in the hospital, the mother would pump her milk into baby bottles.

controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The foregoing list, however, is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See State of TN Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *see also In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006).

The trial court found that termination of the mother's parental rights was in the best interest of the child for a number of reasons including, (1) that the mother failed to effect a lasting adjustment after reasonable efforts by available social agencies, and (2) that a meaningful relationship had not otherwise been established between the child and the mother. The child is now more than two years old, and the mother has not been available to her son since he was one month old except for a few and very brief prison visits.[8] Significantly, the child has been with his foster parents for his entire life and knows of no other home. The trial court found the most meaningful relationship that the child has is with his foster parents and that a present change of the caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition.

The child's best interests must be viewed from the perspective of the child, rather than that of the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). The child has been in a loving foster home with foster parents who have provided him with love and care. Moreover, the foster parents with whom he has lived since he was one month old desire to adopt the child. To allow the child to return to the mother, which could not even be considered until she is released from prison, would only delay the inevitable and cause more lasting harm to the child. Therefore, we find the record establishes by clear and convincing evidence that the termination of the mother's rights is in the best interest of the child.

---

[8]We note with understanding and empathy the fact that the mother has written child numerous letters while incarcerated. Copies of these letters are in the record. They clearly indicate an intent on the mother's behalf to bond with the child; however, letters, with nothing more, fail to overcome what we find to be clear and convincing evidence that it is in the child's best interest to terminate the mother's rights.

## THE DEPARTMENT'S UNREASONABLE PLAN AND FAILURE TO EXPEDITE

As the trial court and now this court found there is clear and convincing evidence that the mother engaged in conduct that exhibited a wanton disregard for the welfare of her child by ingesting drugs during her pregnancy and taking drugs while breast feeding. Although some of the relevant evidence was discovered later, the mother's wanton disregard for the welfare of the child was readily apparent to the Department on March 4, 2004, the day the Department took custody of the child. Moreover, within a few weeks of taking custody of the child, the Department had received essentially all of the relevant information that was ultimately introduced as evidence. The significant evidence the Department obtained within weeks after taking custody included the fact the mother had a recent felony conviction for kidnapping and that she pled guilty to another felony, the offense of facilitation to manufacture methamphetamine, the arrest for which was the catalyst for the Department taking custody of the child on March 4, 2004, and the length of her prison sentence, where she remains today.

Shortly thereafter, and the foregoing facts notwithstanding, the Department proposed and entered into a Plan with the mother, the sole purpose of which was reunification of the parent and child. The Plan called for the mother to improve her lot in life. Unfortunately, with the length of her prison sentence, there was no feasible way she would reasonably comply with the Plan. The point being her failure was inevitable. Thus, the question is why did the Department initiate a plan that had no chance of success? Moreover, why did the Department give the mother false hopes of reunification with her child? Even more troubling is the question, why did the Department allow a child in its custody to drift in a sea of uncertainty for almost a year and a half, when the Department knew or should have known with certainty after a matter of weeks that termination was the inevitable?

Here, the evidence is undisputed that the mother has essentially no relationship with the child. The child was taken into custody when he was one month old and the child was never returned to the mother's custody. In fact, the child never went home with the mother; he remained in the hospital in critical care until he was well enough for the foster parents to take him into their care. The only contact the child had with the mother since birth were visits at the hospital during the first month of his life and, thereafter, there have only been a few visitations at the prison, most of which were separated by bars or glass.

In spite of all the evidence the Department had in March of 2004, when it took custody of the child, and the information it had obtained by the time the mother pled guilty to her latest felony, the Department waited until August 30, 2005 to file a petition to terminate her parental rights. To state that the delay was not in the best interests of the child, the foster parents or the mother is a gross understatement. Indeed, the delay was inexcusable because the Department has an affirmative duty to be diligent and to expedite cases, when the facts justify it, to afford the child the earliest opportunity for permanent placement. *See* Tenn. Code Ann. § 37-1-166(g)(3) and Tenn. Code Ann.

§ 36-1-113(h).  Although we find the Department's conduct so troubling that such conduct may be sufficient to vacate a termination of a parent's rights, this is not such a case.[9]

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to the mother's indigency.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[9]Our dissatisfaction with the Department's delay in this action is not a reflection on counsel of record.  To the contrary, counsel expediently and zealously advocated for their respective clients, and we appreciate the value of their representation throughout these appellate proceedings.