IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2018

## IN RE TEGAN W.

**Appeal from the Juvenile Court for Sullivan County**
**No. 17-JV-41814     Mark Toohey, Judge**

_____

## No. E2017-01748-COA-R3-PT

_____

This is a termination of parental rights case wherein the trial court terminated a mother's parental rights based upon the sole statutory ground of abandonment by incarceration. The court further found that termination of the mother's parental rights was in the best interest of the child. The mother timely appealed. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Elizabeth A. Brady, Sevierville, Tennessee, for the appellant, Kayla W.

Herbert H. Slattery, III, Attorney General and Reporter; Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### BACKGROUND AND PROCEDURAL HISTORY

Appellant Kayla W.[1] ("Mother") gave birth to a son, Tegan W., in September 2011. Mother identified Marco B. ("Father") as the child's father; however, this appeal relates only to the termination of Mother's parental rights.

In 2012, the Tennessee Department of Children's Services (the "Department") received a series of referrals alleging that Tegan W. was being neglected by Mother. As

---

[1] In termination of parental rights cases, it is the policy of this Court to abbreviate the names of minor children and other parties in order to protect their identities.

part of the initial investigation, Mother testified that she agreed to take a drug test for the Department, and she admitted that she tested positive for illegal narcotics. Mother attended a family team meeting with an employee of the Department on December 5, 2012; thereafter, Mother's whereabouts became unknown.

On December 10, 2012, the Department filed a "Petition to Transfer Temporary Legal Custody and for Ex Parte Order" in the juvenile court of Sullivan County, Tennessee (the "trial court"). The Department sought to have Tegan W. adjudicated dependent and neglected, and it asked the trial court to award temporary legal custody of the child to his maternal grandmother, Cindy R. ("Grandmother"). According to the petition, the child was already living with Grandmother when the petition was filed.[2] Because Mother could not be located to be served, a final hearing was never held as a result of the Department's first petition. As discussed in greater detail below, Tegan W. resided with Grandmother until January 2016 when events taking place at Grandmother's home necessitated the child's removal.

Mother has been arrested several times since Tegan W. was first removed from her legal custody in 2012. On January 23, 2014, Officer Brandon Metcalf arrested Mother on a federal warrant arising from her involvement in a conspiracy to counterfeit federal reserve notes in violation of 18 U.S.C. § 371. Mother testified that she was in possession of crack-cocaine when she was arrested by Officer Metcalf, and she was charged and pled guilty to simple possession on September 2, 2014. At trial Mother testified that on November 25, 2014, she pled guilty to the federal conspiracy charge and was sentenced to time-served and released on supervised probation. However, on December 10, 2014, she was arrested for violating the terms of her release by failing to participate in a drug treatment program and by failing to report to her probation officer. Following her arrest, Mother entered into an agreed order, whereby she agreed to serve four months in federal prison, followed by two years of supervised release. The terms of the new supervised release agreement also required Mother to reside in a halfway house for the first six months of her release. On May 31, 2015, Mother was released again, but her release was revoked on July 17, 2015 because she failed to report to the halfway house. Mother testified that instead of reporting to the halfway house, she went on the run as a fugitive to Florida until June 2016. Mother testified that she believed Tegan W. continued to reside with Grandmother while she was incarcerated and on the run as a fugitive, and she stated that she called the child regularly.

---

[2] The Department's petition indicated that Father had not legitimated Tegan W. and stated that placing the child in his custody would pose a substantial risk of harm to the child.

On January 8, 2016, Father brought Tegan W. to the hospital because the child had sustained a life-threatening head injury. Father reported to police that Tegan W. was injured when Father accidently shot him in the head with a pellet gun.[3]

While Tegan W. remained hospitalized on January 12, 2016, a grand jury indicted Father, Grandmother, and several other co-conspirators on a charge of conspiracy to distribute 280 grams or more of crack-cocaine. *See* 21 U.S.C. §§ 846, 841(b)(1)(A). On January 19, 2016 the Department filed a "Petition for Temporary Legal Custody" asking the court to "find [Tegan W.] dependent and neglected, and to award temporary legal custody of the child to [the Department]." On January 19, 2016, the trial court entered a protective custody order and Tegan W. was placed with his maternal uncle. However, the child was subsequently removed from his uncle's custody and placed with his current foster family in August 2016.

Although Mother was still a fugitive, she testified that she learned of Tegan W.'s injuries from a relative in January 2016, and she resolved to return to Tennessee to see the child and to turn herself in. However, the trial court found that Mother did not in fact return to Tennessee until June 2016. An agreed order revoking Mother's supervised release was entered June 29, 2016, and Mother was required to serve a sentence of fifteen months imprisonment with no further supervision to follow.

On February 15, 2017, the Department filed a petition to terminate Mother's parental rights.[4] Hearings were held on June 12, 2017 and July 17, 2017, and Mother and Elizabeth Kemp, a Department employee, testified.[5] On August 14, 2017, the trial court entered a final order terminating Mother's parental rights on the ground of abandonment by incarceration, with the parent having exhibited behavior prior to her incarceration displaying a wanton disregard for the welfare of the child.[6] The trial court also concluded

---

[3] Father was charged with reckless aggravated assault for causing Tegan W.'s injuries.

[4] The Department also sought to terminate Father's parental rights. However, as stated above, the termination of Father's parental rights is not at issue in this appeal. A guardian ad litem was also appointed.

[5] Mother testified over the phone because she remained incarcerated at the time of trial.

[6] Although the trial court did not issue a ruling with respect to the termination of Father's parental rights in the final order terminating Mother's parental rights, the trial court's order included the following language:

> In accordance with Tenn. R. Civ. P. 54.02, as applicable through Tenn. R. Juv. P. 1(d), there is no just reason for delay, and entry of a final order terminating the parental rights of [Mother] and such is directed. The petition was filed as to [Mother] and [Father], and [Mother's] parental rights are separate and distinct from [Father's] rights, i.e. whether one parent's parental rights are terminated has no bearing on the rights of the other parent. Accordingly, this is a final order as to [Mother] and is immediately appealable as

that termination of Mother's parental rights was in Tegan W.'s best interest. Mother timely appealed.

## ISSUES PRESENTED

Mother presents the following issues for our review, which we restate as follows:

- Whether the trial court erred in concluding that the Department established the ground of "abandonment" by clear and convincing evidence.

- Whether the trial court erred in concluding that termination of Mother's parental rights is in the child's best interest.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citation omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, our statute provides that termination of a parent's rights to his or her child must be based upon: "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest of the child." Tenn. Code Ann. § 36-1-113(c).

Because of the gravity of the interests at stake in termination proceedings, Tennessee law imposes a heightened standard of proof—clear and convincing evidence— for the parent's benefit. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. The clear and convincing evidence standard ensures that the facts supporting the statutory grounds are highly probable and helps to ensure fundamental fairness to the parent. *In re Carrington H.*, 483 S.W.3d at 522.

In order to ensure fundamental fairness, this Court must also adapt its customary standard of review in parental termination of rights cases. *In re Audrey S.*, 182 S.W.3d

---

of right to the Court of Appeals pursuant to Tenn. R. App. 3(a).

Accordingly, the order is final with respect to Mother, and this appeal is properly before this Court.

838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

## DISCUSSION

The trial court found that the Department had established, by clear and convincing evidence, that Mother's parental rights to Tegan W. should be terminated because she abandoned him by engaging in conduct that displayed a wanton disregard for his welfare prior to her incarceration and that termination would be in his best interest. *See* Tenn. Code Ann. § 36-1-102; Tenn. Code Ann. § 36-1-113(g)(1). "As long as one statutory ground for termination is established by the facts in [the] case and termination is in the best interest of the [child], the trial court's decision will be sufficiently supported." *In re M.L.P.*, 228 S.W.3d 139, 144 (Tenn. Ct. App. 2007). Mother avers that clear and convincing evidence does not support termination of her parental rights on the ground of abandonment and that termination is not in the child's best interest. Accordingly, we turn to review the ground relied upon by the trial court to determine if clear and convincing evidence supports the court's conclusion, and if so, whether termination of Mother's parental rights is in the child's best interest.

## I. ABANDONMENT BY AN INCARCERATED PARENT

We first turn to review the trial court's determination that Mother abandoned Tegan W. by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the child's welfare. A parent's rights to his or her child may be terminated upon the ground of "abandonment." *See* Tenn. Code Ann. § 36-1-102; Tenn. Code Ann. § 36-1-113(g)(1). The legislature has provided five statutory definitions of acts that constitute the ground of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). The definition of abandonment relevant in this case provides that a parent abandons his or her child when:

> [the] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

*See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).

When relying on this ground the Department must first establish, by clear and convincing evidence, that the parent was incarcerated when the parental termination of rights proceedings were initiated or has been incarcerated during all or part of the four-month period preceding the initiation of the proceedings. *Id*. A parent's incarceration is a strong indicator that the circumstances in the child's home may pose a substantial threat to the child's welfare. *See In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *4 (Tenn. Ct. App. Nov. 2, 2009). It is axiomatic that an incarcerated parent cannot perform their parental duties, so a parent's decision to engage in criminal behavior is itself indicative that the parent may not be fit to care for a child. *Id*. (quoting *In re Audrey S.*, 182 S.W.3d at 866) ("This test for abandonment 'reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child.'"). Accordingly, "[i]ncarceration serves as 'a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.'" *Id*. (quoting *In re Audrey S.*, 182 S.W.3d at 866).

As the statute makes clear, in addition to establishing the "incarceration" element, this ground requires the petitioner to establish that the parent engaged in behavior exhibiting a "wanton disregard" for the welfare of his or her child prior to the parent's incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv). "Wanton disregard" has not been defined statutorily. *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, *2 (Tenn. Ct. App. June 9, 2015). However, our courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child, can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id*. (quoting *In re Audrey S.*, 182 S.W.3d at 871) ("By defining the term by examples, Tennessee courts have recognized 'wanton disregard' in much the same way as former United States Supreme Court Justice Potter Stewart identified pornography: 'we know it when we see it.'");[7] *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse.").

Under this ground for termination, a court is permitted to examine the parent's conduct throughout the course of a child's life to determine if the parent has displayed a wanton disregard for his or her child's welfare. *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *4 (Tenn. Ct. App. Aug. 12, 2009). "The ground of wanton disregard does not require that the conduct referred to occur within the four month window prior to incarceration." *Id*. Indeed, the parent's behavior which warrants termination on this ground may occur before the birth of the child whose welfare is thereby put at risk. *In re Jai'Shaundria D.L.R.*, No. M2011-02484-COA-R3-PT, 2012

---

[7] *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

WL 224424, at *4 (Tenn. Ct. App. June 15, 2012) ("Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero.").

Turning to the facts of the present case, it is undisputed that Mother was incarcerated when these proceedings were initiated in February 2017. With respect to the second element of this ground, the trial court made detailed findings, and concluded that Mother's decisions to use drugs, commit crimes, violate her probation, and general lack of involvement in the child's life reflected a wanton disregard for the welfare of the child. However, on appeal Mother avers that her behavior did not display a "wanton disregard" for the welfare of the child, and she appears to place blame on Grandmother and the probation system rather than accepting the blame for her own unfortunate circumstances. Having carefully reviewed the record, we have determined that clear and convincing evidence supports the trial court's conclusion that Mother demonstrated a wanton disregard for Tegan W.'s welfare prior to her incarceration.

The record reflects that Mother has engaged in a broad spectrum of precarious criminal behavior since she first lost custody of Tegan W. in 2012. *In re S.L.A.*, 223 S.W.3d at 299 ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."). Mother testified (telephonically from federal prison) at trial concerning her criminal behavior and involvement with illegal drugs. She admitted that she failed the Department's drug test in 2012, but she went on to testify that she has never used illegal drugs. However, in 2014, when Mother was arrested for conspiracy to counterfeit United States currency, she admitted to the officer that she was in possession of crack-cocaine. Mother ultimately pled guilty to simple possession of crack-cocaine, but testified at trial that she never intended to use the drugs. When asked at trial by Tegan W.'s guardian ad litem to explain why she was in possession of crack-cocaine if she never intended to use it, the following exchange occurred:

Q: So it wasn't your intentions [sic] to use it?

A: No, Sir.

Q: So what were you doing with it?

A: Honestly, I was selling it.

Q: So you were selling drugs. How often did you do that?

A: That's the only time that I had done it. Well, I was going to do it, but I didn't get a chance to. That's the only time.

Needless to say, Mother's explanation for her possession of the crack-cocaine does not assuage our concerns about her fitness to serve as a responsible caregiver for Tegan W.

As discussed above, Mother pled guilty to the federal conspiracy charge on November 25, 2014, and she was sentenced to time-served and released on supervised probation. Upon her release, Mother had the opportunity to comply with the terms of her probation and participate in Tegan W.'s life. However, Mother does not dispute that her supervised release was revoked because she failed to participate in mandatory drug counseling and maintain contact with her probation officer. When Mother was released again in May 2015, she had an additional opportunity to comply with the terms of her supervised release and work towards becoming a responsible, dependable parent for her child. However, once again, Mother chose not to do so. Instead of complying with the terms of her supervised release by appearing at the designated halfway house, Mother chose to become a fugitive and fled to Florida for over a year.

Furthermore, Mother's behavior upon learning about Tegan W.'s life threatening injury exhibited a wanton disregard for the child's welfare. Although Mother testified that she learned that Tegan W. was unresponsive in the hospital in January 2016, she admitted that she did not return to Tennessee for nearly six months. As a result of Mother's criminal behavior, she has been a fugitive and incarcerated for most of the child's life. At trial, Mother testified that she recognized that she had not been a good mother to Tegan W. and that he did not deserve to experience childhood with a mother in prison. Mother's bad choices and criminal activity demonstrate that she is unfit for her role as a parent to Tegan W. Having carefully reviewed the record, we have concluded that clear and convincing evidence supports the trial court's finding that Mother engaged in conduct prior to incarceration that exhibited a wanton disregard for Tegan W.'s welfare.

## II. BEST INTEREST ANALYSIS

In a termination proceeding, when one statutory ground for termination of a parent's rights has been established, the court must then determine whether clear and convincing evidence indicates that termination of the parent's rights is in the child's best interest. *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994)). Because not all parental misconduct is irredeemable, the statutes governing the termination of parental rights recognize that termination may not always serve the child's best interest. *See In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at * 8 (Tenn. Ct. App. Aug. 30, 2017). However, when the interests of the parent and the child diverge, the courts must always resolve the conflict in favor of the rights and best interest of the child. *Id*. Tennessee law provides that a court may consider the following factors when determining whether termination of parental rights is in the child's best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to [a]ffect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent and guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The factors enumerated above are not exhaustive, and "[t]he statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-PT, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002). Depending on the circumstances of the individual case, the consideration of a single factor, or facts outside the statutory factors, may dictate the outcome. *See In re Miracle M.*, 2017 WL

3836020, at *8. However, "[t]he ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).

The trial court made detailed findings concerning the statutory best-interest factors enumerated above and concluded that clear and convincing evidence supports termination of Mother's parental rights. We now turn to conduct our own review of the record to determine whether clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the child's best interest.

Tegan W. was five years old at the time of trial. Mother lost custody of Tegan W. when he was one year old. We agree with the trial court's finding that Mother has no meaningful relationship with Tegan W. because she has been incarcerated or otherwise absent for the majority of the child's life. She testified that she has never had a job, but that she is working on her GED from prison. She testified that she is also participating in counseling and anger management classes in prison. At trial, Mother expressed her belief that "at the end of the day" she could change to become a better parent, but the following exchange followed when she was questioned by the Department's attorney:

Q: But you understand that the child can't always wait until the end of that [sic] day for his mother. That child needs permanency. That child needs a loving and safe home in which to grow up in that [you] cannot provide him. Is that correct?

A: Yes, Sir.

Q: He deserves to be in a home where people are free of drugs and free of crime. That's what's best for Tegan, isn't it?

A: Yes, Sir.

Q: And that's something that you haven't been able to provide him. Is that right?

A: Yes, Sir.

Despite any efforts made by Mother to improve her parenting abilities from prison, we are unable to conclude that she has exhibited an ability to change her lifestyle in a way that would allow her to serve as an appropriate caregiver to Tegan W. Moreover, the Department's records and Ms. Kemp's testimony make it clear that Tegan W. is doing very well in his foster home where he has been since August 2016. Ms. Kemp testified that Tegan W. calls his foster parents "mom" and "dad," and the foster parents desire to adopt him as soon as possible. Having carefully reviewed the record, we have concluded

that clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in Tegan W.'s best interest.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights on the ground of abandonment by an incarcerated parent, and its determination that termination is in Tegan W.'s best interest. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against the Appellant, Kayla W. Because Kayla W. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE